Marcos SKEVOFILAX, Louise Skevofilax, and Michael Michaels, Plaintiffs,

v.

Sergeant William QUIGLEY, Patrolman Charles L. Fekete, Patrolman Dominick Semenza, Patrolman Fred Galati, Patrolman Roger Boettinger, Patrolman Donald Merker, Patrolman William Revill, Sergeant Louis La Plaga, Sergeant Harold Thomas, individually, and as Police Officers of the Police Department of Edison Township, New Jersey, William T. Fisher, individually and as Chief of the Police Department of Edison Township, New Jersey, Township of Edison, New Jersey, George Leontarakis, Defendants.

Civ. A. No. 79–2783.

United States District Court,
D. New Jersey.

May 2, 1984.

Ira Leitel, New York City, Sara Halbert, Rafael Abramovitz, Brooklyn, N.Y., for plaintiffs.

Peter A. DeSarno, Edison, N.J., for defendant Fisher.

Richard A. Amdur, by John Boyle, Oakhurst, N.J., for defendants Captain's Wheel, Leontarkis & GPAJ, Inc.

C. Douglas Reina, Abrams, Dalto, Gran, Hendricks & Reina, South Plainfield, N.J., for defendant Quigley.

Scott Telson, Lombardi & Lombardi, Edison, N.J., for defendant Estate of Thomas.

Bernard F. Boglioli, West Long Branch, N.J., for defendant Tp. of Edison.

Barry Albin, Morris Brown, Wilentz, Goldman & Spitzer, Woodbridge, N.J., for defendant La Plaga.

Joseph Benedict, Benedict & Altman, North Brunswick, N.J., for defendant Galati.

George Hendricks, Hendricks & Adochio, New Brunswick, N.J., for defendant Fekete.

Michael Justin, Woodbridge, N.J., for defendant Semenza.

John Stockel, Perth Amboy, N.J., for defendant Merker.

Lawrence Bitterman, Bitterman & Buono, New Brunswick, N.J., for defendant Revill.

James D'Alessandro, Such & D'Alessandro, West Orange, N.J., for defendant Boettinger.

## OPINION

BARRY, District Judge.

This action, brought pursuant to 42 U.S.C. § 1983, arises from an altercation between plaintiffs Marcos Skevofilax and Michael Michaels and various Edison Township police officers. The court is confronted, in this pretrial setting, with the question of whether the defendant policemen's claims of qualified immunity should be decided by the court or by the jury. This issue has become pertinent because of the change in the standard for qualified immunity in § 1983 actions that was wrought by *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). For the

reasons set forth below, I hold that the question of whether a public official may use the shield of qualified immunity is ordinarily wholly one of law, to be decided by the court before the commencement of trial, and that under the circumstances of this case, the defendants are not entitled to invoke that defense.[1]

## I

The concept of qualified or "good faith" immunity under 42 U.S.C. § 1983 is of rather recent origin. Section 1983 was largely dormant[2] from its inception in the Civil Rights Act of 1866 and the Ku Klux Klan Act of 1871 until the Supreme Court's decision in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961).[3] Concommitantly, absolute immunity from suit under § 1983 for legislators was not recognized until *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 S.Ct. 1019 (1951) and for judges not until *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), which also held that "the defense of good faith" to a § 1983 action is available to policemen. *Id.* at 555, 87 S.Ct. at 1218.

The contours of a qualified immunity standard were first set out in *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), an action against Ohio's governor and other officials claiming violations of the civil rights of three students killed at Kent State University. Holding that the officials would not be absolutely, but only qualifiedly, immunized for executive acts, the Court stated that "It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct." *Id.* at 247–248, 94 S.Ct. at 1691–1692. The official's reasonableness was to be determined by analyzing the functions of his particular office. *Id.* at 243, 247, 94 S.Ct. at 1689, 1692.

In *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), a suit against school board members by parents of high school students expelled for drinking at school or at school activities, the Court noted general agreement as to the existence of "good faith" immunity, but recognized that lower courts were confused over whether to employ an "objective" or "subjective" standard for determining that immunity. The Court concluded that:

> ... the appropriate standard necessarily contains elements of both. The official himself must be acting sincerely and with a belief that he is doing right, but an act violating a student's constitutional rights can be no more justified by ignorance or disregard of settled, indisputable law on the part of one entrusted with supervision of students' daily lives than by the presence of actual malice. 420 U.S. at 321, 95 S.Ct. at 1000.

To lose the shield of immunity it was, therefore, necessary that only one of the two elements be present:

1. Certain police defendants did not assert the affirmative defense of qualified immunity in answer to the complaint. Those defendants, however, have since moved to amend their answers to include the defense. *See* Fed.R.Civ.P. 15(a). Those motions will be granted.

2. In 1960, only 247 civil rights cases were filed against state and federal officials. Friedman, *The Good Faith Defense in Constitutional Litigation*, 5 Hofstra L.Rev. 501, 501 n. 1 (1977). During a twelve month period in 1982–1983, more than 30,000 § 1983 suits were filed by prisoners alone. Administrative Office, United States Courts, *The United States Courts: A Pictorial Summary for the Twelve-Month Period Ended June 30, 1983* (1983). A study of § 1983 complaints filed by non-prisoners in the Central District of California in 1975 and 1976 found that 44.5% of the filings alleged police misconduct as the basis of the constitutional deprivation. Eisenberg, *Section 1983: Doctrinal Foundations and an Empirical Study*, 67 Cornell L.Rev. 482, 550–551 (1982).

3. *Monroe* held that § 1983 provides a federal right in federal courts; that it applies to officials, including policemen, whose acts are not only not sanctioned by, but are violative of state law; that state remedies need not be exhausted for a § 1983 action to go forward; and that a specific intent to deprive a person of a federal right need not be shown.

(An official) is not immune from liability ... if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the (persons) affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury ...

*Id.* at 322, 95 S.Ct. at 1001.

*Wood* shifted the focus from the functions of the office to the person committing the complained of acts. *See* Comment, *Immunity: Eliminating the Subjective Element from the Qualified Immunity Standard in Actions Brought Against Government Officials*, 22 Washburn L.Rev. 577, 583 n. 46 (Spring 1983). The use of the phrase "knew or should have known" rather than the "reasonably knew" standard previously applied, *see Scheuer, supra* 416 U.S. at 247–248, 94 S.Ct. at 1691–1692; *Pierson v. Ray, supra* 386 U.S. at 557, 87 S.Ct. at 1219, thus expanded the potential for liability by overlaying the pre-existing objective "reasonable person" standard with a subjective standard keyed to the actual knowledge of the defendant. This expansion, coupled with the Court's emphasis on the equality of the subjective and objective as bases for rejecting a qualified immunity defense, resulted in the creation of an almost insuperable obstacle to summary judgment. Judge Gesell, concurring in *Halperin v. Kissinger*, 606 F.2d 1192, 1214 (D.C.Cir.1979), *aff'd*, 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981), discussed this phenomenon:

As I see it, this means that if a plaintiff can establish a genuine material issue of fact as to any element of the immunity defense the case will have to proceed to trial. In my view this approach substantially undermines, if not destroys, the immunity doctrine.

We should not close our eyes to the fact that with increasing frequency in this jurisdiction and throughout the country plaintiffs are filing suits seeking damage awards against high government officials in their personal capacities based on alleged constitutional torts. Each such suit almost invariably results in these officials and their colleagues being subjected to extensive discovery into traditionally protected areas, such as deliberations preparatory to the formulation of government policy and their intimate thought processes and communications at the presidential and cabinet levels. Such discover (sic) is wide-ranging, time-consuming, and not without considerable costs to the officials involved. It is not difficult for ingenious plaintiff's counsel to create a material issue of fact on some element of the immunity defense where subtle questions of constitutional law and a decisionmaker's mental processes are involved. A sentence from a casual document or a difference in recollection with regard to a particular policy conversation held long ago would usually, under the normal summary judgment standards, be sufficient. In short, if these standards are those to be followed in these cases, trial judges will almost automatically have to send such cases to full trial on the merits.

In *Butz v. Economou*, 438 U.S. 478, 507–508, 98 S.Ct. 2894, 2911–2912, 57 L.Ed.2d 895 (1978), the Court, in authorizing qualified immunity for members of the federal executive branch who commit constitutional transgressions while performing their discretionary functions,[4] emphasized that it had

recognized in *Scheuer* that damage suits concerning constitutional violations need not proceed to trial, but can be terminated on a properly supported motion for summary judgment based on the defense of immunity ... In responding to such a motion, plaintiffs may not play dog in the manger; and firm application of the Fed-

---

**4.** *Butz* distinguished constitutional violations, to which qualified immunity applies, from tort liability, for which federal executive officers retain absolute immunity. The focus there was on the type of violation and not merely the functions

of the office, as in *Scheuer,* or on the reasonableness of the person, as in *Wood. See* Freed, *Executive Official Immunity for Constitutional Violations: an Analysis and Critique,* 72 Northwestern University L.Rev. 526 (1977).

eral Rules of Civil Procedure will ensure that federal officials are not harassed by frivolous lawsuits. (footnote and citation omitted).

The harassment, however, continued, and *Harlow v. Fitzgerald, supra,* provided not merely one more articulation by the court of its dissatisfaction and impatience with this harassment, but the teeth which the district courts required to respond to it. *Harlow* was a § 1983 suit by a former Air Force executive who the government claimed had been dismissed because of a departmental reorganization and reduction in force, but who asserted that he was fired in retaliation for his Congressional testimony concerning cost overruns on the C–5A transport plane. With respect to defendants Harlow and Butterfield, two aides to former President Nixon who purportedly were part of a conspiracy to discharge Fitzgerald, the Court held that qualified and not absolute immunity applied. While absolute immunity is improper for most public officers because often only a damage action will vindicate one whose constitutional rights have been violated, Justice Powell, writing for the majority, averred that

> (I)t cannot be disputed seriously that claims frequently run against the innocent as well as the guilty—at a cost not only to defendant officials, but to the society as a whole. These social costs include the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will 'dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.'

457 U.S. at 814, 102 S.Ct. at 2736 (footnote and citation omitted). In order to advance the ability of courts to dismiss insubstantial lawsuits without trial and thus safeguard the interests of deserving officials and of the public, the *Harlow* Court set about "an adjustment of the 'good faith' standard." *Id.* at 815, 102 S.Ct. at 2737.

The Court characterized the objective element of qualified immunity as "a presumptive knowledge of and respect for 'basic, unquestioned constitutional rights,' " while the subjective element referred to " 'permissible intentions.' " *Id.,* quoting *Wood v. Strickland,* 420 U.S. at 322, 95 S.Ct. at 1001. Yet,

> [t]he subjective element of the good-faith defense frequently has proved incompatible with our admonition in *Butz* that insubstantial claims should not proceed to trial. Rule 56 of the Federal Rules of Civil Procedure provides that disputed questions of fact ordinarily may not be decided on motions for summary judgment. And an official's subjective good faith has been considered to be a question of fact that some courts have regarded as inherently requiring resolution by a jury.

*Id.* 457 U.S. at 815–816, 102 S.Ct. at 2737–2738 (footnotes omitted). The Court perceived substantial policy reasons favoring the rejection of any inquiry into the subjective "good faith" of government officials in the performance of their discretionary functions:

> (T)he judgments surrounding discretionary action almost inevitably are influenced by the decision maker's experiences, values, and emotions. These variables explain in part why questions of subjective intent so rarely can be decided by summary judgment. Yet they also frame a background in which there often is no clear end to the relevant evidence. Judicial inquiry into subjective motivation therefore may entail broad ranging discovery and the deposing of numerous persons, including an official's professional colleagues. Inquiries of this kind can be peculiarly disruptive of effective government.

*Id.* at 816–817, 102 S.Ct. at 2738–2739 (footnotes omitted).

The Court, therefore, concluded that government officials should not be subjected to discovery or trial on the basis of bare allegations of malice. Rather, "... government officials performing discretionary

functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 817, 818, 102 S.Ct. at 2738, 2739. The Court made clear that this new, completely objective, standard for qualified immunity is equally applicable to a § 1983 claim raised against a state official or a suit brought directly under the Constitution against a federal official. *Id.* at 818, n. 30, 102 S.Ct. at 2739, n. 30.

The objective test was expressly intended to "permit the resolution of many insubstantial claims on summary judgment", with the court determining whether the law pertaining to the claimed violation was clearly established at the time of the alleged misconduct. *Id.* at 818, 102 S.Ct. at 2739. However, the Court refused to set out a technique for making that determination. *Id.* at 818 n. 32, 102 S.Ct. at 2739 n. 32. It did disallow discovery until the "threshold immunity question is resolved," and it added that

> If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct. Nevertheless, if the official pleading the defense claims extraordinary circumstances and can prove that he neither knew nor should have known of the relevant legal standard, the defense should be sustained. But again, the defense would turn primarily on objective factors.

*Id.* at 818–819, 102 S.Ct. at 2739–2740. Concurring, Justice Brennan, joined by Justices Marshall and Blackmun, explicated the "exceptional circumstances" caveat of the majority, adding that "some measure of discovery may sometimes be required to determine exactly what a public official did 'know' at the time of his actions." However, Justice Brennan agreed that summa-

ry judgment would be "readily available" to defendants whenever the law was ambiguous at the time of the alleged wrong or the plaintiff could not prove that a violation of constitutional rights actually occurred, and that discovery would be deferred pending any Rule 56 motion. *Id.* at 821, 102 S.Ct. at 2740.

## II

■ Based upon *Harlow* and its progeny, I must conclude that the effect of *Harlow* is not merely to "greatly reduc[e] the exposure of most government officials to civil suit," *The Supreme Court, 1981 Term: Immunity of the President and Other Government Officials*, 96 Harvard L.Rev. 226, 233 (1982), but also that that decision requires, except in the most unusual circumstances, that the question of whether defendants will be entitled to qualified immunity be decided by the court prior to the commencement of a jury trial, either as the result of a motion for summary judgment or *sua sponte* in a pretrial hearing. The jury will thus not be required to trouble itself with resolution of a legal issue that is beyond its responsibilities and its competence as triers-of-fact, i.e. whether those of plaintiff's rights claimed to have been violated by defendants were clearly established at the time of the alleged violations.[5]

■ In determining whether a defendant should receive the benefit of qualified immunity, the issue is almost invariably one of determining whether, as an objective matter, the defendant reasonably should have known the law under which his conduct is being assessed. Because ignorance of the law is never a defense in these matters, a defendant is presumed to know what the law is—if that law is clearly established. Thus, the inquiry reduces to a determination as to whether the law with respect to the conduct in question is settled

---

**5.** By necessary implication, of course, in those unusual cases in which a defendant claims "extraordinary circumstances", the court must determine as a pre-trial matter whether the issue of that defendant's knowledge of the relevant legal standard has been resolved by discovery. If unresolved, the court must submit the question of the defendant's entitlement to qualified immunity to the jury.

or unsettled, a determination clearly beyond the jury's competence.

In the instant case, plaintiffs contend that the defendants participated in inflicting on them an illegal, unprovoked, and merciless beating. If plaintiffs are correct as a matter of fact, there cannot be any arguable claim that the officers' conduct was privileged—a policeman cannot defend by contending, for example, that he never heard of the Fourth or the Eighth Amendments. It is for the jury to determine the factual issue as to the conduct, not the legal issue as to the law. Unlike the typical negligence case, in which a jury can bring its collective human wisdom to bear in determining what is reasonable under a given set of circumstances, to suggest that *Harlow* did not mean what it said and what it implied is to suggest that a trial within a trial is required, with the jury hearing "evidence" of the state of the law, trends in the law, and clarity of the law.

■ The process of determining the clarity of the law at the time a cause of action purportedly arose is, moreover, most appropriately resolved by the court at a "pre-trial screening," [6] a proposition inferred from the conclusions of *Scheuer, Butz,* and *Harlow* that insubstantial claims may be terminated on motions for summary judgment. In ruling on such motions, of course, the court's function is not to resolve factual issues but, rather, to determine whether any genuine material factual issue exists. *Adickes v. Kress,* 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). The moving party has the burden of showing the absence of a genuine issue as to any material fact and of showing that it is

entitled to judgment as a matter of law. In ruling on the motion, the court must draw all inferences of fact against the movant and in favor of the party opposing the motions. *Id.* To hold, as the Supreme Court has in *Harlow,* that summary judgment motions on the question of qualified immunity will be readily entertained, is to hold that absent exceptional circumstances that may have prevented an official from knowing the law relevant to his or her office, no genuine, material issue of fact ordinarily appears which might prevent or delay a ruling as to whether a defendant's actions were violative of clearly established law. *See Forsyth v. Kleindienst (Forsyth II),* 729 F.2d 267 at 275 (3d Cir.1984) (objective standard now permits summary judgment for official if law not clearly established or if extraordinary circumstances exist).

Courts that have applied *Harlow* in the context of summary judgment motions have concluded that the determination of whether a government official is entitled to immunity is solely a question of law. *See Czurlanis v. Albanese,* 721 F.2d 98, 108 (3d Cir.1983); *Bell v. Sellevold,* 713 F.2d 1396, 1402 (8th Cir.1983); *Evans v. Dillahunty,* 711 F.2d 828, 830 (8th Cir.1983); *Ellsberg v. Mitchell,* 709 F.2d 51, 69 (D.C.Cir.1983); *Hauptmann v. Wilentz,* 570 F.Supp. 351, 371 (D.N.J.1983).

Thus far, courts have resolved questions as to whether the law at the time of actions challenged under § 1983 was clearly established with an almost equal number of decisions granting summary judgment when the law was not clearly established and denying summary judgment when it was.[7]

**6.** The *Harvard Law Review* Note cited *supra* discusses, at 234–236, what it terms the "pretrial screening proposal" advanced by Judge Gessel in *Halperin, supra.* This proposal was not expressly adopted by the Court in *Harlow,* but the Court quoted Judge Gessel *in extenso. See* 457 U.S. at 817 n. 29, 102 S.Ct. at 2738 n. 29. The proposal advocated testing the sufficiency of plaintiff's evidence on the immunity issue before trial. However, after *Harlow,* the test is not whether plaintiff can show that defendant failed to act in "good faith", but whether defendant can show that, regardless of any factual

proofs, qualified immunity applies because of unsettled law or, rarely, because defendant could not have known settled law. *See* Comment, *Degree of Immunity Applicable to Senior Aides of the President of the United States in Civil Actions Arising Under the Constitution: Harlow v. Fitzgerald,* 1983 Brigham Young University L.Rev. 426.

**7.** *See Ross v. Reed,* 719 F.2d 689, 695 (4th Cir. 1983) (law re: disciplining of prisoner for sending coercive letters to prison official does not clearly establish First Amendment right); *Harris*

In deciding whether to grant or deny summary judgment, courts are plainly concluding that they have before them pure questions of law which should never reach a jury. Not only is this true in the context of summary judgment motions, but also in the context of motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Hauptmann v. Wilentz, supra* at 371; *Jensen v. Conrad, supra* at 101. In the latter context, courts have concluded that defendants either have or have not met their burden of establishing by a preponderance of the evidence that the relevant law was clearly established at the time of the actions to which a plaintiff objects. *Alexander v. Alexander,* 706 F.2d 751, 754 (6th Cir.1983); *Matje v. Leis, supra* at 929; *Dehorty v. New Castle County Council, supra* at 891.

Prior to *Harlow,* the *Wood* test for qualified immunity presented a jury question not only in the case in which a plaintiff claimed that the official had been stripped of immunity because he undertook the action with the malicious intention to cause a constitutional deprivation or other injury, but also in the case in which a plaintiff claimed that a defendant knew or should have known that his action would violate plaintiff's rights. It seems abundantly clear, then, that because the Supreme Court's intention in *Harlow* was to promote the use of summary judgment whenever an appropriate immunity defense is raised in a § 1983 action, the Court has, with *Harlow,* not only eliminated the prong of the *Wood* test that considered the presence or absence of malice, but also has relegated the question of defendant's knowledge of the law to the "extraordinary circumstances"

*v. Young,* 718 F.2d 620, 623 (4th Cir.1983) (law re: access to law library in local jail not clearly established); *Scott v. Greenville County,* 716 F.2d 1409, 1423 n. 24 (4th Cir.1983) (constitutional prohibition against racially discriminatory application of zoning and permit issuance laws clearly established); *Jackson v. Hollowell,* 714 F.2d 1372, 1377 (5th Cir.1983) (law re: prisoner's right to be free from inadequately screened trusty shooters clearly established); *Barnett v. Housing Authority of City of Atlanta,* 707 F.2d 1571, 1582 (11th Cir.1983) (law re: official's property right in public employment clearly established); *Segarra v. McDade,* 706 F.2d 1301, 1306 (4th Cir.1983) (law re: when a witness must be called and when hearing officer may refuse to hear testimony on behalf of prison inmate not clearly established); *Ward v. Johnson,* 690 F.2d 1098, 1113 (4th Cir.1982) (same).

*See also Alexander v. Alexander,* 573 F.Supp. 373, 376 (M.D.Tenn.1983) (law re: incoming governor refusing to release prisoner whose sentence commuted by outgoing governor not clearly established); *Smith v. Montgomery County,* 573 F.Supp. 604, 610 (D.Md.1983) (law re: strip searching of pretrial detainees was not clearly established prior to Fourth Circuit decision, was clearly established after that decision; qualified immunity from liability prior to decision, no immunity after decision); *Alexander v. Polk,* 572 F.Supp. 605, 621 (E.D.Pa.1983) (law re: entitlement to supplemental food program not clearly established); *Engblom v. Carey,* 572 F.Supp. 44, 47 (S.D.N.Y.1983) (law re: Third Amendment rights of corrections officers whose residence used to house National Guard members during strike not clearly established);

*Matje v. Leis,* 571 F.Supp. 918, 929 (S.D.Ohio 1983) (law re: adequacy of supervision in county jail clearly established); *Jones v. Waters,* 570 F.Supp. 1292, 1297 (E.D.Pa.1983) (law re: warrantless arrest of suspect in home not clearly established); *Hauptmann v. Wilentz, supra* at 371–375 (law re: various Fourth and Sixth Amendment questions not clearly established); *Jensen v. Conrad,* 570 F.Supp. 91, 103, 127 (D.S.C.1983) (law did not clearly establish that action under Fourteenth Amendment would lie against social service board member or home health care nurse for failure to adequately train or supervise social workers dealing with abusive parents); *Clemente v. United States,* 568 F.Supp. 1150, 1170 (C.D.Cal.1983) (law re: due process owing when discrimination claim made clearly established); *Douglas v. Galloway,* 568 F.Supp. 966, 967, 970 (S.D.W.Va.1983) (law re: right of public employee not to be discharged because of political affiliation where affiliation no appropriate requirement for position clearly established); *Evans v. Headley,* 566 F.Supp. 1133, 1139 (S.D.N.Y.1983) (prisoner's right to hearing re involuntary protective custody not clearly established); *Muzychka v. Tyler,* 563 F.Supp. 1061, 1065 (E.D.Pa.1983) (law re: seizure of documents found in car while police searching for chemicals clearly established by Supreme Court decision handed down three weeks before search); *Dehorty v. New Castle County Council,* 560 F.Supp. 889, 892 (D.Del.1983) (law on patronage firings clearly established); *Hixon v. Durbin,* 560 F.Supp. 654, 665 (E.D.Pa.1983) (law re: deprivation of property interest in contrast with state not clearly established); *Heslip v. Lobbs,* 554 F.Supp. 694, 702 (E.D.Ark.1982) (law re: public drunkenness in private home not clearly established).

exception to the general *Harlow* rule with a jury question presented only when that knowledge is in dispute.

Even where there are such "extraordinary circumstances" claimed, the Court has instructed that the defense would still turn primarily on objective factors. 457 U.S. at 819, 102 S.Ct. at 2739. While it is not clear whether any officials actually invoked the "extraordinary circumstances" exception in any of the post-*Harlow* cases cited above, in certain of those cases such an invocation would have been appropriate. Yet, even in those cases, the courts were faithful to *Harlow*'s prescription of adherence to an objective standard throughout.

For example, in *Muzychka v. Tyler, supra,* summary judgment on the ground of qualified immunity was denied where policemen, searching for chemicals which they had probable cause to believe were in plaintiff's car, seized documents as to which a privilege was claimed. The court explicitly found that there was "clearly established" law at the time of the alleged action because, three weeks before the search, Justice Stevens had explained in *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), that the scope of a warrantless search of a vehicle is defined by the object searched out and the places in which there is probable cause to believe it to be and not by the nature of the container in which the object might be found. *See also Smith v. Montgomery County, supra* (law became clearly established and qualified immunity evaporated with controlling decision of court of appeals).[8]

▮ If even the exception to the objective standard is itself largely objective, then the instance in which a determination concerning qualified immunity involves a jury issue would be rare indeed. The jury's role is still critical, however. It determines whether the official did, in fact, violate the law that the court has previously declared to have been clearly established. Only when the "extraordinary circumstances" exception has been properly invoked and there is an issue of what the official knew that has not been resolved by discovery, *see Harlow, supra* 457 U.S. at 821, 102 S.Ct. at 2740 (Brennan, J., concurring), would the jury's role extend to actually resolving a question implicating a claimed immunity.

In that connection, it should be noted that those courts which, after *Harlow,* have treated the allocation to judge or jury of questions concerning immunity, have done so largely on the basis of pre-*Harlow* decisions. For example, in *Tuttle v. City of Oklahoma City,* 728 F.2d 456 at 458 (10th Cir.1984), the widow of a man who a police officer had "fatally shot ... without the least justifiable provocation," *Id.* at 459, sued the policeman and the City under § 1983. The court stated, at 458 that

> Under certain circumstances, the facts may negate the good faith defense as a matter of law. If the facts construed in the light most favorable to the defendant officer utterly belie his belief or the reasonableness of it, his defense should not be considered by the jury.

The court relied for this proposition on a 1978 Seventh Circuit case and, while acknowledging that *Harlow* "overruled earlier Supreme Court pronouncements that a subjective component existed (to the qualified immunity test)," *Id.,* it nevertheless focused on the subjective test that had been employed under earlier Supreme Court decisions, that is, on the policeman's

---

8. Use of the objective standard does not mean that whenever one is arrested and it is later determined that he had not committed the offense charged or it turns out that a search was improper, it must be held that the arresting or searching officers violated clearly established law. See *Saldana v. Garza,* 684 F.2d 1159, 1164–1165 (5th Cir.1982), *cert. denied* 460 U.S. 1012, 103 S.Ct. 1253, 75 L.Ed.2d 481 (1983); *Jones v. Waters, supra.* The "extraordinary circumstances" exception allows that where an officer did not or should not have known that the law did not establish the sufficiency of "probable cause" to arrest or proscribe the search undertaken, he may still claim "extraordinary circumstances", such as the recentness or extreme complexity of a governing decision. No factual dispute requiring a jury determination is raised thereby, however.

"belief" (essentially the test in *Pierson v. Ray* and *Scheuer v. Rhodes*).

Similarly, in *B.C.R. Transport Co., Inc. v. Fontaine*, 727 F.2d 7 (1st Cir.1984), a case in which a wrongful search and seizure was allegedly conducted by one officer Fontaine, it was stated that

the question of qualified immunity is one of reasonableness—would a reasonable person in the shoes of Fontaine have known that he was violating another's constitutional rights? .... This determination, being one turning on the reasonableness of Fontaine's conduct, was properly left for the jury to resolve.

*Id.* at 10 (citations omitted). The *B.C.R. Transport* court cited to *Harlow, Pierson* and a 1979 Fifth Circuit case. Again, the focus was on the pre-*Harlow* standard of the reasonableness of the defendant's belief in the legality of his actions.[9]

What is evidenced by these decisions is a reluctance to recognize in the trial context what has been readily recognized in the summary judgment context, i.e. that the Supreme Court, which has zealously safeguarded and, indeed, enlarged the function of the jury as a factfinding body, has converted what were largely factual determinations into a determination of law. Implicit in this reluctance is a conscious or subconscious unwillingness to take an issue from the jury, and a belief, albeit unexpressed, that to do so would in some manner derogate the right of trial by jury declared by the Seventh Amendment.

Moreover, and put more simply, old habits die hard, and it is easy enough to submit a "reasonableness" question to the jury with or without having provided the jury with any basis for knowing the law as to which it must decide the defendant reasonably should or should not have known. However, to the extent that courts—for whatever reason—continue to treat the issue of qualified immunity in much the same manner as it was treated pre-*Harlow*, the very purpose of *Harlow*, which was to "make an adjustment" so that a court would ordinarily determine whether the claimed violation involved clearly established law, is defeated.

### III

Plaintiffs allege that three of the police defendants, who were off-duty in a bar at the time, administered an unprovoked beating to plaintiff Marcos Skevofilax and punched plaintiff Michael Michaels, and that one of them struck Michaels in the face when Michaels tried to aid Skevofilax. Plaintiffs also contend that uniformed officers, who were called to the scene by Skevofilax, not only did not aid plaintiffs, but contributed to a merciless second beating of Skevofilax, one of them by striking Skevofilax on the head with a nightstick and the others by watching the beating and failing to intervene. Furthermore, plaintiffs assert that they were then falsely arrested and imprisoned and maliciously prosecuted, but not before there were additional attempted assaults by one of the defendants and a failure to administer needed medical treatment to Skevofilax within a reasonable time.

▮▮▮ It is beyond cavil that if such a course of conduct were proven, those found to be liable for such actions would be devoid of any qualified immunity for the laws of which defendants' actions are alleged to be violative are clearly established. If what the ancients said of the law remains true, that *lex nemini operatur iniquum* —the law will not work an iniquity on anyone—then the law will not shield an official who flagrantly violates the Constitutional rights of another in the manner asserted here. Indeed, the case law is uniform that no vestige of official immunity will serve to fend off liability in damages when the gravamen of a complaint is official use of unwarranted force in violation of the Fourth, Eighth and Fourteenth Amendments, and the claims are proven. *See Haygood v. Younger*, 718 F.2d 1472,

---

**9.** In other cases involving submission to a jury of the question of qualified immunity, it appears that trial was held before the *Harlow* decision was handed down. *See, for example, Seguin v. Eide*, 720 F.2d 1046, 1047 n. 1 (9th Cir.1983).

1484 (9th Cir.1983); *Jackson v. Hollowell, supra*, at 1376; *Stokes v. Delcambre*, 710 F.2d 1120 at 1125–26 (5th Cir.1983); *McQurter v. City of Atlanta*, 572 F.Supp. 1401, 1415 (N.D.Ga.1983); *Ladnier v. Murray*, 572 F.Supp. 544, 546–47 (D.Md.1983).

While use of excessive force by police may create § 1983 liability, *see Black v. Stephens*, 662 F.2d 181 (3d Cir.1981), *cert. denied*, 455 U.S. 1008, 102 S.Ct. 1646, 71 L.Ed.2d 876, *reh. denied*, 456 U.S. 950, 102 S.Ct. 2022, 72 L.Ed.2d 475 (1982); *Howell v. Cataldi*, 464 F.2d 272 (3d Cir.1972), § 1983 is not, of course, a general tort statute. Plaintiffs must show that the injury inflicted rose to the level of a constitutional tort, i.e. that it was so egregious as to exceed the boundaries of wrongful injuries redressable under tort law and deprived the victim of a Fourteenth Amendment liberty interest without due process of law. *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Shillingford v. Holmes*, 634 F.2d 263 (5th Cir. 1981). The test employed by the Third Circuit is whether the police conduct "shocks the conscience." *Rhodes v. Robinson*, 612 F.2d 766, 772 (3d Cir.1979), quoting *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952). If the assaults alleged here so "shock the conscience" that liability is found, the assaults would, of necessity, be in violation of clearly established law, and, as a matter of law, the defendants would not be entitled to qualified immunity.

The same result obtains for both the supervisory and non-supervisory policemen present during the alleged beatings and the alleged denial of medical care. Supervisory officials may not be held liable under § 1983 under the doctrine of *respondeat superior*. *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, if a plaintiff shows that the official was personally involved in the unlawful action or that there was some causal connection between an act of the official and the alleged violation, the supervisor might be held liable. *Wanger v. Bonner*, 621 F.2d 675 (5th Cir.

1980); *Baskin v. Parker*, 602 F.2d 1205, 1208–09 (5th Cir.1979).

Furthermore, if a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under § 1983. *See Bruner v. Dunaway*, 684 F.2d 422, 426 (6th Cir.1982), *cert. denied* 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983); *Putman v. Gerloff*, 639 F.2d 415, 423 (8th Cir.1981); *Harris v. Chanclor*, 537 F.2d 203, 206 (5th Cir.1976); *McQurter v. City of Atlanta, supra* at 1415; *Davidson v. Dixon*, 386 F.Supp. 482 (D.Del.1974), *aff'd* 529 F.2d 511 (3d Cir. 1975). In the leading case on the duty to intervene, *Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir.1972), the Seventh Circuit stated:

We believe it is clear that one who is given the badge of authority of a police officer may not ignore the duty imposed by his office and fail to stop other officers who summarily punish a third person in his presence or otherwise within his knowledge. That responsibility obviously obtains when the nonfeasor is a supervisory officer to whose direction misfeasor officers are committed. So, too, the same responsibility must exist as to nonsupervisory officers who are present at the scene of such summary punishment, for to hold otherwise would be to insulate nonsupervisory officers from liability for reasonably foreseeable consequences of the neglect of their duty to enforce the laws and preserve the peace.

Defendants Township of Edison and the Chief of Police, stand on a somewhat different footing and may be liable only if a causal link between an official policy or custom and plaintiffs' injuries is established. *Monell v. Department of Social Services, supra* 436 U.S. at 694 n. 58, 98 S.Ct. at 2037 n. 58; *Rizzo v. Goode*, 423 U.S. 362, 371, 375, 96 S.Ct. 598, 604, 606, 46 L.Ed.2d 561 (1976); *Black v. Stephens, supra* at 191. However, the Township may not assert the good faith of its officers or agents as a defense to liability under

§ 1983.  *Owen v. City of Independence,* 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980).

▇▇ Moreover, where it is shown that a municipality's failure to train, supervise, or discipline police officers is reckless or grossly negligent, this will be taken to mean that an official policy or custom which results in constitutional violations exists or that there is conduct by officials in authority evincing implicit authorization, approval or acquiesence in unconstitutional conduct.  *Popow v. City of Margate,* 476 F.Supp. 1237, 1245 (D.N.J.1979).  Where a municipality's procedure of reprimand is so inadequate as to ratify unconstitutional conduct, the municipality may be liable under § 1983.  A police chief who persistently fails to discipline or control subordinates in the face of knowledge of their propensity for improper use of force thereby creates an official custom or *de facto* policy actionable under § 1983.  *Id.* at 1246–1247.  *See also* Crocker, *When Cops are Robbers— Municipal Liability for Police Misconduct Under Section 1983 and Bivens,* 15 University of Richmond L.Rev. 295, 301– 302 (1981).

A plaintiff is obligated in a suit against a municipality under § 1983 to specifically identify the official policy which he claims was responsible for the deprivation of some right.  *Ross v. Meagan,* 638 F.2d 646, 650 (3d Cir.1981).  Here, in paragraphs 46 and 47 of the complaint, plaintiffs allege that the Chief of Police and the Township failed to adequately train, instruct, supervise and control the individual police officer defendants and that both the Chief and the Township knew or should have known of prior unlawful conduct and a propensity toward the use of, or permitting the use of, excessive force.

▇▇ In a similar case, *Pitrone v. Mercadante,* 420 F.Supp. 1384, 1387 (E.D.Pa. 1976), *vacated on other grounds* 572 F.2d 98 (3d Cir.), *cert. denied* 439 U.S. 827, 99

S.Ct. 99, 58 L.Ed.2d 120 (1978), the complaint asserted that the police chief knew or had reason to know beforehand of the violent propensities and overzealousness of the officers involved in an unconstitutional arrest, detention and beating, yet took no remedial action.  It was held that this allegation of personal culpability on the chief's part was sufficient to withstand a motion to dismiss.  It has also been held that municipal inaction, such as the persistent failure to discipline a subordinate who violates the civil rights of others, could give rise to an inference of unconstitutional conduct within the meaning of *Monell.  Batista v. Rodriguez,* 702 F.2d 393 (2d Cir.1983).  Were plaintiffs here to prove the role that they have assigned in their complaint to the Chief of Police and the Township, these defendants would thus not be immune from liability under § 1983.

▇▇ The same principles that apply to those portions of the complaint that charge the use of excessive force apply with equal force to claims that defendants were indifferent to plaintiff Skevofilax's medical needs.  Eighth Amendment standards are applied to pre-trial detainees in this Circuit, *Hampton v. Holmesburg Prison Officials,* 546 F.2d 1077, 1079–1080 (3d Cir.1976); that is, the *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) standard of "deliberate indifference to serious medical needs", 429 U.S. at 106, 97 S.Ct. at 292, or callous or conscious indifference to such needs, *Jerry v. Francisco,* 632 F.2d 252, 256 n. 5 (3d Cir.1980).  The allegations here of a vicious beating, coupled with the claim made in paragraph 36 of the complaint that Skevofilax was only partially conscious at the time that he was brought into the police station and was held there for an unreasonable amount of time and without medical care, would, if proven, meet the *Estelle v. Gamble* standard, and none of the defendants would be immune from liability for this constitutional violation.[10]

---

**10.** The liability of the Chief of Police and Township on this ground would follow only if they knew or had reason to know of the propensities

of the defendant officers not to provide adequate medical care to pre-trial detainees or if the Township had otherwise adopted an official

A wrongful arrest may, of course, be violative of the arrestee's Fourth Amendment rights if the arrest is carried out without cause. In the instance of a warrantless arrest, there is no difficulty attributing causation for any constitutional violation that accompanies the arrest directly to the arresting officer or officers. *See, generally,* Comment, *When Police Lie: Federal Civil Rights Liability for Wrongful Arrest,* 10 Ohio Northern University L.Rev. 493 (1983). Although all arrests based upon probable cause, even if erroneous, are legal and immunity is, therefore, unnecessary, 1 Cook & Sobieski, Civil Rights Actions § 2.09(B) at 2–120 (1983), an arrest without any cause would certainly implicate the Fourth Amendment and would not be immunized, since nothing in the law of search and seizure is more clearly established than, absent consent, the necessity of probable cause for an arrest.

Even if the question of the immunity of a police officer against whom a false arrest action under § 1983 has been instituted must be resolved against the background of common-law tort principles, including those principles relating both to liability and to available defenses, *Imbler v. Pachtman,* 424 U.S. 409, 418, 96 S.Ct. 984, 989, 47 L.Ed.2d 128 (1976); *Douthit v. Jones,* 619 F.2d 527, 533 (5th Cir.1980), it has long been established that under New Jersey law a public official may be held liable for false arrest or imprisonment where he has acted outside his authority. *Pollack v. City of Newark, N.J.,* 147 F.Supp. 35 (D.N.J.), *aff'd* 248 F.2d 543 (3d Cir.1957), *cert. denied* 355 U.S. 964, 78 S.Ct. 554, 2 L.Ed.2d 539 (1959), *reh. denied* 362 U.S. 907, 80 S.Ct. 614, 4 L.Ed.2d 558 (1960). If plaintiffs prove that defendants arrested and imprisoned them without any basis in law, then those defendants shown to have taken part in the wrongful conduct will clearly be without immunity for their actions. The same principle should apply with respect to any malicious prosecution that may have reached constitutional dimensions.

policy that had that effect. *See Ross v. Meagan,* *supra.*

## IV

I conclude, then, that as a result of the changes in the law of immunity that flow from *Harlow v. Fitzgerald,* this court is fully responsible for deciding the question of whether the defendants may invoke official immunity. In the circumstances of this case, where it is alleged that defendants carried out or condoned excessive, unprovoked assaults, arrests, imprisonments and prosecutions, it would contravene both precedent and persuasive authority to permit an immunity defense were the claims alleged proved to the satisfaction of a jury. The court, therefore, will submit the facts to the jury and instruct it in the relevant law without reference to question of qualified immunity.